**Dock SIMMONS, Appellant,**

v.

**Anthony J. CELEBREZZE, Secretary of Health, Education, and Welfare, Appellee.**

**No. 10256.**

United States Court of Appeals
Fourth Circuit.

Argued April 6, 1966.

Decided June 1, 1966.

E. Carl Meadows, Jr., Beckley, W. Va. (Clay S. Crouse, Beckley, W. Va., on brief), for appellant.

Jack H. Weiner, Atty., Dept. of Justice (John W. Douglas, Asst. Atty. Gen., Kathryn H. Baldwin, Atty., Dept. of Justice, and Milton J. Ferguson, U. S. Atty., on brief), for appellee.

Before SOBELOFF and BOREMAN, Circuit Judges, and BARKSDALE, District Judge.

SOBELOFF, Circuit Judge:

Dock Simmons' claim for disability benefits was denied by the Social Security Administration, and on Simmons' petition for review the District Court granted the Secretary's motion for summary judgment. The Secretary does not dispute that the claimant is suffering from the effects of a fracture of the knee and a hip injury sustained in an automobile accident in 1959, but argues in support of the District Court's action that the claimant's disabilities are not of such a nature and severity as to preclude substantial gainful activity consistent with his age, education and occupational experience.

Simmons, now 44 years old, is entitled to benefits if he was disabled within the meaning of the Act [1] on or before September 30, 1962, the last date of coverage. The testimony must be evaluated with this date in mind.

On March 9, 1961, the claimant's personal physician, Dr. L. B. Todd, was of the view that Simmons was "unable to do usual work since injury in 1959—still disabled." Simmons was referred by the West Virginia Rehabilitation Division to Dr. H. H. Kuhn, who recommended surgery, which he performed on May 4, 1961. Shortly thereafter Dr. Kuhn described Simmons' post-operative condition as "very good." He re-examined Simmons on October 19, 1961 and again on January 26, 1962, and concluded that the "patellar (kneecap) grafting that I did is holding well and (the patient) has good quadriceps power." The doctor recommended continued exercise, as prescribed immediately after the operation, and counseled the patient to avoid "heavy physical manual labor."

On June 26, 1962, approximately one year after the operation and three months before the determinative date, Dr. Todd, the claimant's personal physician who before the operation had expressed the opinion that Simmons was disabled, now reported to the Social Security Administration that "my findings of this patient are such that I cannot recommend that he be classified as totally and permanently disabled." However, on January 4, 1963, three months after the determinative date, Dr. Todd declared that Simmons could not do any kind of physical labor.[2] Because the medical reports do

---

1. Sections 216(i) and 223 of the Social Security Act, as amended by Act of July 30, 1965, Pub.L. 89–97. 42 U.S.C.A. §§ 416(i) and 423.

2. Other doctors also submitted reports. The two most favorable to Simmons' claim could reasonably be deemed by the fact finder entitled to less weight than the opinions of Dr. Todd and Dr. Kuhn, treating physicians who examined the patient on a number of occasions and at times closer to the crucial date, September 30, 1962. One of these physicians was Dr. J. E. Echols, who examined Simmons on May 7, 1963, and considered him unemployable. However, Dr. Echols saw Simmons only once in connection with his leg injury, and this examination was not very extensive. Accordingly this may have diminished the significance of the opinion in the judgment of the fact finder. Cyrus v. Celebrezze, 341 F.2d 192, 196 (4th Cir.

not definitively resolve the issue of the severity of claimant's disability, a review of the evidence relating to Simmons' vocational activities takes on special importance.

Although claimant's family lives in Quinwood, West Virginia, Simmons was last employed before his accident by the National Screw and Manufacturing Company in Cleveland, Ohio, where he worked for three years as a plater learner, concededly skilled labor. Following the accident, from April 19, 1960 until April 6, 1962, he worked as a laborer in a program conducted by West Virginia's Rehabilitation Division and received assistance from the State's program for Aid to Dependent Children. The work he performed for the Rehabilitation Division was the clearing and gathering of brush along the highway.

Simmons testified at the hearing on September 11, 1964,[3] that he owned 152 acres of wood land which he had bought in 1960, and that in August, 1964, he completed cutting the wood for pulp. He further testified that from April, 1964 through August, 1964, he supervised the cutting and delivery of the pulpwood, and demonstrated to his son how to use a gasoline driven saw to cut the trees. The pulpwood had to be delivered to the buyer 65 miles away, and Simmons admitted that he drove the delivery truck part of the way. During 1963 and 1964, aside from the pulpwood operation, claimant also engaged in buying and selling cows, and occasionally milked them himself.

In October, 1962, and January, 1963, Simmons was refused employment as a gasoline station attendant because of his leg and hip injuries. However, it appears that the conclusions of the three service station operators that Simmons was unable to work were based primarily on statements to that effect made to them by Simmons.

In light of the claimant's activity in connection with his pulpwood enterprise and his cows, and in light of his work for the Rehabilitation Division, we cannot say that there is a lack of substantial evidence to support the conclusion of the Hearing Examiner that Simmons "has pursued many activities in the last several years quite inconsistent with the suggestion that he suffers from intractable pain."

There is evidence that *this* claimant can engage and has engaged in a *particular* occupation. This concrete showing compels affirmance of the Secretary's conclusion that the claimant's disabilities are not of such severity as to prevent him from engaging in substantial gainful activity, despite the fact that a contrary conclusion may also be reasonable. The case is, therefore, quite different from those where the Secretary, in denying benefits, relies on abstractions based on the Department of Labor's "Dictionary of Occupational Titles" to support his determination that jobs are generally available to "average" persons of the claimant's general class. We have reversed the Secretary in those cases, and have consistently rejected such perfunctory resort to theoretical vocational guidelines for the so-called "average" man. E. g., Williams v. Celebrezze, 359 F.2d 950 (4th Cir. 1966); Wimmer v. Celebrezze, 355 F.2d 289 (4th Cir. 1966); Hall v. Celebrezze, 347 F.2d 937 (4th Cir. 1965); Cyrus v. Celebrezze, 341 F.2d 192, 196–197 (4th Cir. 1965); Ray v. Celebrezze,

1965). The other physician was Dr. R. L. Anderson, who after examining the claimant in August, 1964, reported that he had difficulty in getting up and walking and was handicapped by multiple arthritis of the spine, hips, and knees. Dr. Anderson's examination, though apparently more thorough than Dr. Echols', was not made till nearly two years after the determinative date.

3. An earlier hearing was held on August 29, 1963, following which the Hearing Examiner denied claimant's application for benefits. Upon motion of the Secretary, however, the District Court on April 14, 1964, remanded the case for further proceedings, and the September 11, 1964 hearing ensued.

340 F.2d 556 (4th Cir. 1965).[4] The record here is different, for it furnishes a substantial, though debatable, factual rather than speculative basis for the administrative decision.

Affirmed.

4. We have also reversed the denial of benefits where a regulation designed to supplement and guide in the administration of the statute was applied so dogmatically as to subvert the statute and its basic goal. Heslep v. Celebrezze, 356 F.2d 891 (4th Cir. 1966). See also Marion v. Gardner, 359 F.2d 175 (8th Cir. 1966). Reversal was similarly compelled where the denial of benefits was the product of an unwarranted disregard of subjective testimony. Mode v. Celebrezze, 359 F.2d 135 (4th Cir. 1966). See Heslep v. Celebrezze, supra; Celebrezze v. Walter, 346 F.2d 156 (5th Cir. 1965).